AO 91 (Rev. 11/11) Criminal Complaint                    Trial Attorney Andres Q. Almendarez (202) 258-7149

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SYED MEHDI HUSSAIN, and
SYED MURTUZA KABLAZADA

CASE NUMBER: 25 CR 255

**UNDER SEAL**

**FILED**

5/9/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.


On or about May 11, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, SYED MEHDI HUSSAIN and SYED MURTUZA KABLAZADA, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, by submitting and causing to be submitted, a claim for the provision of eight OTC kits to beneficiary S.D., when such services were not provided. |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

Randell M. Harold by MV

_____
Randell M. Harold
Special Agent, FBI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and

Affidavit by telephone.

Date: <u>May 9, 2025</u>

_____
*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>Hon. Maria Valdez, U.S. Magistrate Judge</u>
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Randell M. Harold, being duly sworn, state as follows:

1.     I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI"). I have been so employed since June 2022.

2.     My duties and responsibilities as an FBI Special Agent include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code, Section 1343 (wire fraud) and Title 18, United States Code, Section 1347 (health care fraud). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests. I am a graduate of the FBI Special Agent Basic Training Program. In addition, I am a certified public accountant.

3.     This affidavit is made in support of an application for: (i) a complaint charging SYED MEHDI HUSSAIN ("HUSSAIN") and SYED MURTUZA KABLAZADA ("KABLAZADA") with health care fraud, in violation of Title 18, United States Code, Section 1347 (the "**Subject Offense**"); (ii) a search warrant for the cellular telephone assigned call number (773) 366-6874 (the "**Subject Phone 1**") and any cellular telephone found on the person of KABLAZADA or within his

1

immediate control; (iii) a search warrant for the cellular telephone assigned call number (331) 289 − 9625 (the "**Subject Phone 2**") and any cellular telephone found on the person of HUSSAIN, or within his immediate control; (iv) a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for prospective and historical location and other information associated with the **Subject Phone 1**, whose service provider is T-Mobile US, Inc. ("Provider"), a wireless telephone service provider headquartered in Parsippany, New Jersey; and (v) a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for prospective and historical location and other information associated with the **Subject Phone 2**, whose service provider is T-Mobile US, Inc. ("Provider"), a wireless telephone service provider headquartered in Parsippany, New Jersey

4. As a provider of wireless communications service, Provider is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15).

5. Because two of the requested warrants seek the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), and because the warrants seek the installation and use of a pen register and a trap and trace device, the requested warrants are designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrants therefore include all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

2

6.     The FBI and United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG") are investigating a nationwide scheme that has resulted in more than $500 million in false and fraudulent claims submitted to Medicare. The scheme involves hundreds of laboratories and durable medical equipment ("DME") businesses located across at least 17 different states that have illegally used Medicare beneficiary data from Marketing Company 1. After acquiring Medicare beneficiary data from Marketing Company 1, the businesses utilize the data to fraudulently submit claims for over-the-counter COVID-19 test kits ("OTC kits"), respiratory panel tests, and for DME such as back, knee, or shoulder braces that were not requested, medically unnecessary, and/or sometimes not provided to Medicare beneficiaries.

7.     The scheme typically involves an individual or small group of individuals recruiting a nominee owner to serve as the face of the fraudulent entity on state incorporation documents and bank accounts, and to conduct financial transactions at the direction of the leaders of the scheme. After recruiting the nominee owner, the individuals involved in the scheme submit a high volume of fraudulent health care claims to Medicare. Upon receipt of funds from Medicare, the fraudulent proceeds are rapidly dispersed to a variety of entities and individuals in an effort to shield the proceeds from administrative and law enforcement actions including bank account freezes and seizure of funds.

8.     Cooperating witness 1 ("CW1") was recently charged in the Northern District of Illinois with engaging in such a scheme. In addition to the charged conduct,

3

CW1 has also made statements to law enforcement confirming CW1's role in this scheme and has provided information, further described in part below, that KABLAZADA and HUSSAIN were also involved in this scheme.

9. As part of the investigation, and as described further below, law enforcement identified Illinois-based businesses connected to KABLAZADA and HUSSAIN, including CHICAGO CARE LAB SERVICES LLC ("CHICAGO CARE"), V CARE TESTING CENTRE CORP. ("V CARE"), and AL-AMEER TESTING CENTER INC. ("AL-AMEER"). As described further below, there is probable cause to believe that between in or around February 2023 through in or around June 2023, at the direction of KABLAZADA, HUSSAIN, and others, CHICAGO CARE, V CARE, and AL-AMEER obtained Medicare beneficiary data from Marketing Company 1, utilized this data to have CHICAGO CARE, V CARE, and AL-AMEER submit fraudulent claims to Medicare, and thereby profited from the health care fraud scheme.

10. Further, there is probable cause to believe that evidence and instrumentalities of the **Subject Offense** will be located within **Subject Phone 1**, which is believed to be a phone currently used by KABLAZADA that was used by KABLAZADA in furtherance of the **Subject Offense**, and within **Subject Phone 2**, which is believed to be a phone currently used by HUSSAIN in furtherance of the **Subject Offense**. Because, as described further below, the locations of **Subject Phone 1** and **Subject Phone 2** are not known, but they are believed to be in the possession of KABLAZADA and HUSSAIN, respectively, there is also probable cause

to believe that prospective location information of **Subject Phone 1** and **Subject Phone 2** will lead to evidence and instrumentalities of the **Subject Offense**.

11. As described further below, both KABLAZADA and HUSSAIN have used multiple phones in furtherance of the **Subject Offense** and frequently change phone numbers. Accordingly, there is probable cause to believe that evidence and instrumentalities of the **Subject Offense** will be located on any cellular phone on their persons or within their immediate control.

12. I have not included every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to believe that KABLAZADA and HUSSAIN committed the **Subject Offense**; that evidence related to the **Subject Offense** will be found in the **Subject Phone 1**, **Subject Phone 2**, and any cellular phone found on the person of or within the immediate control of KABLAZADA or HUSSAIN; and that the requested location and other information from Provider for **Subject Phone 1** and **Subject Phone 2** will lead to evidence and instrumentalities of the **Subject Offense**.

## I. BACKGROUND INFORMATION

### A. Background Information on Medicare

13. The Medicare Program ("Medicare") is a federally funded program that provides free and below-cost health care benefits to people aged 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS"), an

agency of HHS, is responsible for the administration of Medicare. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

14. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covers outpatient physician services, such as office visits, minor surgical procedures, DME, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

15. "Part C" of Medicare, commonly referred to as "Medicare Advantage," provides enrolled beneficiaries with services typically covered under Parts A and B, in addition to optional supplemental benefits, and is administered by private insurance companies.

16. Medicare "providers" include clinical laboratories, physicians, DME companies, and other health care providers who provide items and services to beneficiaries. In order to have the capability to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements to which the provider must agree before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

6

17.     A beneficiary eligible for Medicare may choose to be covered under "original" Medicare, where qualifying items and services are covered under Parts A and B, or under Part C (Medicare Advantage). A beneficiary who selects coverage under Medicare Advantage enrolls in a Medicare Advantage plan managed by a private insurance company ("Medicare Advantage Plan"). *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28. A Medicare Advantage Plan is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

18.     Under Part C, CMS pays a Medicare Advantage Plan a monthly fixed, capitated (per beneficiary) amount, adjusted by the expected risk of each beneficiary.

19.     Medicare Advantage Plans are required to provide at least the same benefits as traditional Medicare. Medicare Advantage Plans must "provide coverage of, by furnishing, arranging for, or making payment for, all services that are covered by Medicare Part A and Part B," which includes coverage for DME. *See* 42 U.S.C. § 1395w-22(a)(1); 42 C.F.R. § 422.101.

20.     Medicare Advantage Plans receive, adjudicate, and pay claims from providers seeking reimbursement for the cost of health care benefits, items, or services provided to Medicare beneficiaries. Each Medicare Advantage Plan operates an internal investigation unit responsible for conducting investigations of potential fraud, waste, and abuse. *See* 42 C.F.R. § 422.503(b)(4)(vi).

21.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare

7

seeking reimbursement for covered benefits, items, and services. In the past, BINs were composed of either a beneficiary's Social Security Number or randomly selected numbers and letters. Since 2015, Congress mandated CMS phase out the use of Social Security Numbers, and CMS now assigns Medicare beneficiaries a randomly generated number called a Medicare Beneficiary Identifier ("MBI"). One purpose of this change was to improve patient identity protection and prevent identity theft. These MBIs and BINs are considered "means of identification" pursuant to 18 U.S.C. § 1028(d)(7).

22.    The Investigations Medicare Integrity Contractor (the "I-MEDIC") is a CMS contractor that conducts investigations into fraud, waste, and abuse in the Medicare Parts C and D programs. The I-MEDIC receives and investigates complaints from many sources including Medicare beneficiaries and Medicare Advantage Plans. When appropriate, the I-MEDIC refers cases to law enforcement.

23.    Medicare Advantage Plans must comply with CMS's general coverage guidelines included in Medicare manuals and instructions unless superseded by CMS's Part C regulations or related instructions. *See* 42 C.F.R. § 422.101(b)(2). No Medicare payment may be made under Part A or Part B for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). Accordingly, Medicare Advantage Plans may not pay for DME that is not medically necessary. *See also* 42 C.F.R. § 422.1122(a)(6) and Medicare Managed Care Manual, Chapter 4, Sections 10.2 and 10.16.

24.     In cases where Medicare rules require that services be ordered or referred by a physician or other qualified practitioner, the provider authorizing the service is known as the "referring provider."

25.     A National Provider Identifier ("NPI") is a unique ten-digit identification number issued to health care providers by CMS. All health care providers that transmit health information in electronic form, including claims for payment, must obtain an NPI. CMS developed the National Plan and Provider Enumeration System ("NPPES")[1] to assign NPIs. Health care providers may apply for an NPI by completing an online application. The online application process consists of registering for an Identity & Access User ID and completing the NPI application, which includes identifying the organization, its Employer Identification Number, providing the business mailing and practice addresses, and designating a contact person, including identifying that individual's title, email address, and telephone number.[2]

### B.     Background on COVID Over the Counter Test Kits

26.     In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC kits per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health

---

[1] The NPPES website is an HHS-maintained database which maintains publicly available information regarding health care providers.

[2] *See* National Provider Identifier Standard (NPI), https://www.cms.gov/medicare/regulations-guidance/administrative-simplification/how-apply (last accessed April 17, 2025).

emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC kits per month at no cost to beneficiaries. However, on February 9, 2023, Medicare announced that it was allowing a one-year grace period for providers to bill OTC kits that were provided to beneficiaries prior to May 11, 2023, but that the provider was unable to bill prior to the May 11, 2023, deadline.

27.     To receive reimbursement from Medicare for the OTC kits, providers must submit a claim form with certain information regarding the Medicare beneficiary. As relevant here, the claim form must identify the type of services provided (using a Healthcare Common Procedure Coding System, or "HCPCS" code), and the HCPCS code for OTC kits is "K1034." CMS's guidance to providers billing for these OTC kits is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."

### C.      Background on Location and Other Information

28.     In my training an experience, I have learned that Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data

or latitude-longitude data, or timing advance data) and cell-site data (also known as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via (1) GPS tracking technology built into the phone; (2) timing advance data based on a device's registrations with the provider's cell towers and a measurement of the corresponding distance; or (3) by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.[3]

29.     Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of the **Subject Phone 1** and **Subject Phone 2**, including by initiating a signal to determine the location of the **Subject Phone 1** and **Subject Phone 2** on Provider's network or with such other reference points as may be reasonably available.

---

[3] Further, accuracy of results within these capabilities can vary. For example, the accuracy of timing advance records can depend on a device's distance from a network element, or on the number of network elements available to calculate the distance to the target device.

11

30.     Based on my training and experience, I know Provider can collect cell-site data about the **Subject Phone 1** and **Subject Phone 2**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

31.     Based on my training and experience, I know that telephone companies like the Provider can collect cell-site data about the **Subject Phone 1** and **Subject Phone 2**. I also know that wireless providers such as the Provider typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. CDRs are a type of these records, and they contain data regarding telecommunication transactions without providing the content of that transaction. In part, the data contained in these CDRs includes cell site information utilized during the transaction.

32.     Based on my training and experience, I know that telephone companies like the Provider also collect data about the speed with which signals travel between

12

cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as the Provider use PCMD and other data to calculate and record the estimated location of that cellular telephone. The Provider refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call").

33. Based on my training and experience, I know that telephone companies like the Provider collect Radio Signal Strength Indicators ("RSSI") data. RSSI is a measurement of how well a device can hear, detect and receive signals from any wireless access point or Wi-Fi router.

34. Based on my training and experience, I know that telephone companies like the Provider also collect Media Access Control ("MAC") addresses. A MAC address is a unique identifier assigned to a network interface that allows communication on a physical network segment.

35. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers, as transmitted from a cellular device to a cellular antenna or tower, can

13

be recorded by pen register and trap and trace devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

36. Based on my training and experience, I know that wireless providers such as Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Subject Phone 1** and **Subject Phone 2**'s user or users and may assist in the identification of co-conspirators.

37. Finally, I know that telephone companies such as the Provider collect Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, Wi-Fi hotspot locations, Wi-Fi ID history, and IP history location. Because every device that connects to the Internet must use an IP address, IP address information can help to identify location information.

14

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. Chicago Care Lab Services LLC, V Care Testing Centre Corp., and Al-Ameer Testing Center Inc. Submitted Fraudulent Claims for OTC kits to Medicare.

38. The investigation began in May 2023, when law enforcement agencies detected a massive spike in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased, followed by complaints from Medicare beneficiaries on whose behalf OTC kits were billed to Medicare but who did not receive OTC kits. As explained in greater detail below, CHICAGO CARE, V CARE, and AL-AMEER operated as purported laboratories located in the Chicago metropolitan area that participated in this scheme by fraudulently billing Medicare throughout 2023 for OTC kits that were not provided as represented.

### 1. Chicago Care Lab Services LLC

39. According to data provided by Medicare, between on or about February 13, 2023, and on or about June 1, 2023, CHICAGO CARE submitted approximately 634,963 claims to Medicare seeking approximately $76,195,270 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that CHICAGO CARE has been paid approximately $56,336,366[4] for those claims.

---

[4] According to financial records for the account receiving Medicare deposits for CHICAGO CARE, CHICAGO CARE received approximately $56,775,617.12 in deposits from National Government Services Inc. ("NGS INC."), the Medicare contractor who processes payments on behalf of Medicare between on or about March 1, 2023, and on or about June 30, 2023.

40. Law enforcement initiated an investigation into CHICAGO CARE in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased. Further, as of on or about November 5, 2024, approximately 42,926 Medicare beneficiaries filed complaints against CHICAGO CARE alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to them, even though they did not request, and in some cases, did not receive, the OTC kits. The investigation determined that CHICAGO CARE submitted fraudulent claims to Medicare and that Medicare paid millions of dollars in reimbursement to CHICAGO CARE for those claims.

41. On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 636 for thirteen accounts held at various banks and associated with the CHICAGO CARE funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) the thousands of complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with five Medicare beneficiaries (and/or the beneficiaries' spouses) who further confirmed to law enforcement that the OTC

---

Medicare payment records in claims data and actual payments made into a bank account can vary for a variety of reasons including differences in dates from the respective source data. The Medicare claims data for CHICAGO CARE is stated as of June 7, 2023, while financial records for the CHICAGO CARE Medicare Account have been received through June 30, 2023.

kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and in at least one instance, not received; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with CHICAGO CARE's prior Medicare billing history; and (d) billing by CHICAGO CARE for OTC kits that were purportedly requested by and delivered to at least approximately 31 deceased beneficiaries.

42.     For example, on or about June 1, 2023, law enforcement interviewed Medicare beneficiary S.D. by telephone regarding claims for OTC kits billed to Medicare by CHICAGO CARE, AL-AMEER, and two additional laboratories, purportedly for the benefit of S.D. S.D. related that he/she never requested nor received OTC kits from any of the four laboratories that purported to provide OTC kits to S.D., including CHICAGO CARE and AL-AMEER. S.D. further advised that he/she never responded to any telephone calls, text messages, or e-mails from anyone soliciting OTC kits. Additionally, S.D. explained that he/she worked at a diagnostic testing laboratory that provided testing to him/her whenever he/she needed it, and would have had no use for the OTC kits. Law enforcement reviewed the Medicare claims data for CHICAGO CARE and AL-AMEER, which included a claim submitted to Medicare by CHICAGO CARE and AL-AMEER on or about May 11, 2023, and on or about May 1, 2023, respectively, for OTC kits purportedly provided to S.D. on or about July 5, 2022, and on or about March 23, 2023, respectively. CHICAGO CARE and AL-AMEER were each paid approximately $94.08 for those claims.

17

43.     According to an electronic funds transfer ("EFT") agreement included with Medicare Provider Enrollment, Chain, and Ownership System ("PECOS") records, Medicare monies for claim reimbursement by CHICAGO CARE were to be electronically deposited into CHICAGO CARE checking account at JPMorgan Chase xxxxx9668 (the "CHICAGO CARE Medicare Account") starting approximately on or about July 18, 2022. Consistent with the general scheme set forth above, records received from JPMorgan Chase for the CHICAGO CARE Medicare Account indicate that between on or about March 30, 2023, and on or about May 24, 2023, CHICAGO CARE wired approximately $3,417,353.52 to Marketing Company 1.

44.     According to financial institution records, Individual A.S. became a signor on the CHICAGO CARE Medicare account on or about March 9, 2023, and the sole signor on the account starting on or about May 10, 2023. According to records from the Illinois Secretary of State, CHICAGO CARE was formed on or about January 19, 2022, by Individual K.K., and Individual A.S. was added as a manager of CHICAGO CARE on or about February 2, 2023.

45.     In addition to the CHICAGO CARE Medicare Account, Individual A.S. became the signatory on bank accounts for an additional Illinois-corporation, Falcon Ada, Inc. ("Falcon Ada"). According to financial records, between on or about July 27, 2022, and on or about May 2, 2023, Individual A.S. opened more than 10 accounts in the name of Falcon Ada at various financial institutions including Bank of America, BMO Harris, JPMorgan Chase, and US Bank. According to records obtained from the Illinois Secretary of State, articles of incorporation were filed by Individual A.S. on

18

or about July 21, 2022, establishing Falcon Ada, but no other publicly available filing history exists. According to financial institution records, between on or about March 29, 2023, and on or about May 24, 2023, Falcon Ada received approximately $21,692,074.87 from the CHICAGO CARE Medicare Account, and V CARE checking account xxxxx0975 at BMO Harris bank (the "V CARE Medicare Account"). Of that amount, Falcon Ada transmitted an additional approximately $1,990,524.63 to Marketing Company 1.

46.     Based on records received from the United States Customs and Border Protection ("CBP"), Individual A.S. left the United States on or about May 27, 2023, and has not returned.

## 2.     V Care Testing Centre Corp.

47.     According to data provided by Medicare, between on or about April 7, 2023, and on or about May 31, 2023, V CARE submitted approximately 623,719 claims to Medicare seeking approximately $74,846,280.00 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that V CARE has been paid approximately $55,664,689.92[5] for those claims.

---

[5] According to financial records for the V CARE Medicare Account, V CARE received approximately $21,745,593.12 in deposits from NGS INC. between on or about August 22, 2022, and on or about May 25, 2023. Medicare payment records in claims data and actual payments made into a bank account can vary for a variety of reasons including payment suspensions initiated after a claim has been approved for payment, but prior to the payment being released into the respective bank account. V CARE was placed on a payment suspension and approximately $33,965,063.55 is being held in a suspension escrow account as of on or about April 15, 2025.

48.     Law enforcement initiated an investigation into V CARE in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased. Further, as of on or about November 14, 2024, approximately 36,966 Medicare beneficiaries filed complaints with Medicare against V CARE, alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to them, even though they did not request, and in some cases, did not receive, the OTC kits. The investigation determined that V CARE submitted fraudulent claims to Medicare and that Medicare paid millions of dollars in reimbursement to V CARE for those claims.

49.     On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 631 for three accounts held at various banks and associated with the fraudulent V CARE funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) more than one thousand complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with six Medicare beneficiaries (and/or relatives of the Medicare beneficiaries) who further confirmed to law enforcement that the OTC kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and in at least one instance, not received; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with V CARE's prior Medicare billing history;

20

and (d) billing by V CARE for OTC kits that were purportedly requested by and delivered to at least approximately 86 deceased beneficiaries.

50. According to an EFT agreement included with Medicare PECOS records, Medicare monies for claim reimbursements by V CARE were to be electronically deposited into the V CARE Medicare Account starting approximately on or about August 6, 2022. Financial institution records show that V CARE also maintained a second account at BMO Harris: xxxxx4595. Consistent with the general scheme set forth above, records received from BMO Harris for the V CARE Medicare Account and V CARE account xxxxx4595 indicate that between on or about May 1, 2023, and on or about May 23, 2023, V CARE wired approximately $3,909,082.00 to Marketing Company 1.

51. According to records from BMO Harris, on or about March 18, 2022, Individual M.A. opened the V CARE Medicare Account at BMO Harris. On or about May 23, 2023, Individual A.K. and Individual I.M. replaced Individual M.A. as the signatories on the V CARE Medicare Account. According to records from the Illinois Secretary of State, V CARE was incorporated on or about February 7, 2022, by Individual M.A., and Individual A.K. was added as the president of V CARE on or about March 17, 2023.

52. Based on records received from CBP, Individual M.A. was booked on a flight leaving the United States on or about May 27, 2023,[6] Individual A.K. left the

---

[6] Records received from CBP did not indicate whether Individual M.A. was on board for his/her flight departing the United States.

United States on or about June 4, 2023, and Individual I.M. left the United States on or about June 28, 2023, and have not returned.

### 3. Al-Ameer Testing Center Inc.

53. According to data provided by Medicare, between on or about April 3, 2023, and on or about June 1, 2023, AL-AMEER submitted approximately 635,721 claims to Medicare seeking approximately $76,286,520.00 in reimbursement for OTC kits purportedly provided to Medicare beneficiaries. As of on or about June 7, 2023, Medicare records indicate that AL-AMEER has been paid approximately $58,277,467.92[7] for those claims.

54. Law enforcement initiated an investigation into AL-AMEER in May 2023, when law enforcement agencies detected an increase in Medicare billing for OTC kits, including for OTC kits purportedly provided to Medicare beneficiaries who were deceased. Further, as of on or about November 5, 2024, approximately 33,769 Medicare beneficiaries filed complaints with Medicare against AL-AMEER, alleging their Medicare numbers were used to bill Medicare for OTC kits purportedly provided to them, even though they did not request, and in some cases, did not receive, the

---

[7] According to financial records for AL-AMEER checking account xxxxx9668 at Bank of America (the "AL-AMEER Medicare Account"), the AL-AMEER Medicare Account received approximately $58,285,276.56 in deposits from NGS INC. between on or about April 19, 2023, and on or about June 30, 2023. Medicare payment records in claims data and actual payments made into a bank account can vary for a variety of reasons, including differences in dates from the respective source data. The Medicare claims data for AL-AMEER is stated as of June 7, 2023, while financial records for the AL-AMEER Medicare Account are through June 30, 2023. Additionally, AL-AMEER was placed on a payment suspension and approximately $86,089.36 is being held in a suspension escrow account as of on or about April 15, 2025.

OTC kits. The investigation determined that AL-AMEER submitted fraudulent claims to Medicare and that Medicare paid millions of dollars in reimbursement to AL-AMEER for those claims.

55. On or about June 23, 2023, U.S. Magistrate Judge Jeffrey Cole authorized a seizure warrant in case number 23 M 638 for seven accounts held at various banks and associated with the fraudulent AL-AMEER funds. As set forth in the application for the seizure warrant, probable cause for the seizure was based on, among other evidence: (a) more than one thousand complaints filed by Medicare beneficiaries alleging they did not request or, in some cases, receive the OTC kits that were billed to Medicare; (b) law enforcement interviews with seven Medicare beneficiaries who further confirmed to law enforcement that the OTC kits billed to Medicare using the beneficiaries' Medicare identification numbers were not requested, and not received by these Medicare beneficiaries; (c) analysis of Medicare claims data which demonstrated an increase in Medicare billing that was inconsistent with AL-AMEER's prior Medicare billing history; and (d) billing by AL-AMEER for OTC kits that were purportedly delivered to at least approximately 61 deceased beneficiaries.

56. According to an EFT agreement included with Medicare PECOS records, Medicare monies for claim reimbursement by AL-AMEER were to be electronically deposited into the AL-AMEER Medicare Account starting approximately on or about August 21, 2022. AL-AMEER also maintained a second account at Bank of America: xxxxx4599. Consistent with the general scheme set forth above, records received from

23

Bank of America for the AL-AMEER Medicare Account and AL-AMEER account xxxxx4599 indicate that between on or about April 24, 2023, and on or about May 18, 2023, AL-AMEER wired approximately $4,279,483.00 to Marketing Company 1.

57. According to banking records for the AL-AMEER Medicare Account, Individual H.M. was the sole signor on the AL-AMEER Medicare Account from on or about April 11, 2023, until on or about May 26, 2023, when an additional signor, Individual Z.M., was added. According to records from the Illinois Secretary of State, AL-AMEER was incorporated on February 9, 2022, by Individual M.S. These corporate filings show Individual A.A. then became the president, director, and secretary of AL-AMEER on or about February 14, 2023, and Individual H.M. became the registered agent for AL-AMEER on or about April 4, 2023.

58. Based on records received from CBP, Individual H.M. left the United States on or about June 9, 2023, and has not returned.

## B. KABLAZADA and HUSSAIN Knowingly Participated in the Fraudulent Scheme

### 1. Statements Made by CW1 Regarding KABLAZADA and HUSSAIN's Role in the Fraudulent Scheme

59. On or about December 3, 2024, CW1 was charged by criminal complaint with one count of health care fraud[8] related to CW1's role in an OTC kit fraud scheme involving Laboratory 1, a Chicago-based laboratory that was enrolled as a Medicare provider. Following CW1's arrest on or about December 4, 2024, CW1 was

---

[8] See *United States of America v. CW1*, No. 24 CR 555 (N.D. Ill.) *(under seal)*.

24

interviewed by law enforcement on several occasions between on or about December 19, 2024, and on or about April 15, 2025,[9] during which CW1 related that KABLAZADA and HUSSAIN were the true owners of CHICAGO CARE, V CARE, and AL-AMEER, as explained in greater detail below.

60.     CW1 explained that KABLAZADA and HUSSAIN recruited and then directed nominee owners for CHICAGO CARE, V CARE, and AL-AMEER, for the purpose of concealing their own involvement in the fraudulent scheme. CW1 stated that he/she and co-conspirator 2 ("CC-2") helped facilitate KABLAZADA and HUSSAIN's operation of CHICAGO CARE, V CARE, and AL-AMEER in various ways, including through the sale of Medicare beneficiary data obtained from Marketing Company 1 so CHICAGO CARE, V CARE, and AL-AMEER could bill Medicare for OTC kits. CW1 stated that he/she began selling Medicare beneficiary data or "leads" to KABLAZADA and HUSSAIN beginning in or around February 2023 for approximately $32 per patient lead.

61.     CW1 additionally explained that CC-2 provided medical billing services for CHICAGO CARE, V CARE, and AL-AMEER. Under this arrangement, CC-2 charged KABLAZADA and HUSSAIN an additional fee for the use of CC-2's biller

---

[9] CW1 has a prior criminal history which includes two felony convictions for aggravated driving under the influence, both of which occurred in 2023. CW1 is cooperating in the hopes of receiving credit for that cooperation in connection with his/her pending criminal case. No promises were made to CW1 in regard to how his/her cooperation may affect the resolution of his/her pending criminal charges or his/her sentence. As described further below, the reliability of CW1's information has been corroborated by, among other things, contemporaneous WhatsApp messages and statements made by additional witnesses.

("Billing Company 1"). CW1 explained he/she knew that KABLAZADA and HUSSAIN utilized Billing Company 1 because CC-2 sent explanation of benefit ("EOB") forms from Billing Company 1 related to CHICAGO CARE, V CARE, and AL-AMEER's OTC kits billing directly to CW1 for the purpose of calculating CW1's commission.

62.     CW1 explained he/she was aware that neither KABLAZADA, HUSSAIN, nor any nominee owner connected to CHICAGO CARE, V CARE, or AL-AMEER, were shipping the OTC kits that CHICAGO CARE, V CARE, and AL-AMEER billed Medicare for. CW1 further explained he/she was aware that many of the claims submitted for OTC kits that Billing Company 1 submitted on behalf of CHICAGO CARE, V CARE, and AL-AMEER were "back-billed" for purported dates of service (i.e. shipment dates) that predated the acquisition of those laboratories by HUSSAIN and KABLAZADA, meaning HUSSAIN and KABLAZADA could not possibly have caused those laboratories to have actually shipped the OTC kits on the dates of service reflected in the submitted claims.

63.     Finally, CW1 explained he/she witnessed KABLAZADA and HUSSAIN make payments to CW1 and CC-2 for the leads and billing services CW1 and CC-2 provided to KABLAZADA and HUSSAIN for CHICAGO CARE, V CARE, and AL-AMEER. CW1 said these payments were made in various ways, including one instance where KABLAZADA provided CW1 a duffel bag containing approximately $250,000 in United States currency, which CW1 then delivered to CC-2.

26

64.     CW1 identified an unlabeled Illinois driver's license photograph of KABLAZADA as a person CW1 knows as "Murtaza" and an unlabeled driver's license photograph of HUSSAIN as HUSSAIN.

> **2.      KABLAZADA and HUSSAIN Utilized KABLAZADA Cellular Phone 1, HUSSAIN Cellular Phone 1, and HUSSAIN Cellular Phone 2 to Communicate with CW1 and CC-2 in Furtherance of the Fraud Scheme**

65.     On or about December 2, 2024, U.S. Magistrate Judge Sheila M. Finnegan authorized a search and seizure warrant in case number 24 M 938 for a cellular telephone subscribed to CW1 ("CW1's Cellular Phone"), which was executed on or about December 4, 2024, when CW1's Cellular Phone was seized from CW1.

66.     Based on CW1's review of WhatsApp chats recovered by law enforcement during a search of CW1's Cellular Phone, CW1 identified KABLAZADA as the user of cellular phone number (630) 754 -6564 ("KABLAZADA Cellular Phone 1")[10] and identified HUSSAIN as the user of cellular phone numbers (630) 280-0010 ("HUSSAIN Cellular Phone 1")[11] and (312) 230-8261 ("HUSSAIN Cellular Phone 2").[12]

---

[10] According to records received from T-Mobile on or about October 16, 2023, KABLAZADA's Cellular Phone 1 number was resold through Lycaplus, and the account was suspended, with subscriber records being unavailable.

[11] According to records received from T-Mobile on or about February 11, 2025, HUSSAIN's Cellular Phone 1 number was subscribed to 'SYEDMEHDI HUSSAIN' between on or about November 16, 2022, and on or about September 16, 2023.

[12] According to records received from T-Mobile on or about October 11, 2023, HUSSAIN's Cellular Phone 2 number was subscribed to 'ASSMOKES INC' between on or about October 19, 2022, and on or about May 19, 2023.

67.     During its forensic review of CW1's Cellular Phone, law enforcement recovered hundreds of electronic communications corroborating CW1's statements about the acts and roles KABLAZADA and HUSSAIN played in the fraud scheme involving CHICAGO CARE, V CARE, and AL-AMEER, including two WhatsApp group chats in which CW1, CC-2, KABLAZADA, and HUSSAIN exchanged messages relating to CHICAGO CARE, V CARE, and AL-AMEER, and three chats in which CW1 directly communicated with KABLAZADA and HUSSAIN, respectively.

>    **ii.     February–March 2023: KABLAZADA and HUSSAIN Used Cellular Phones to Discuss Preliminary Steps to Facilitate Fraudulent Billing Through CHICAGO CARE, V CARE, and AL-AMEER**

68.     As discussed in more detail below, during February and March 2023, HUSSAIN used HUSSAIN Cellular Phone 1 and HUSSAIN Cellular Phone 2, and KABLAZADA used KABLAZADA Cellular Phone 1, to communicate with CW1 and CC-2 about various steps necessary to facilitate fraudulent billing through CHICAGO CARE, V CARE, and AL-AMEER, including discussions surrounding the acquisition of the laboratories, obtaining the necessary credentials to bill Medicare, and acknowledgement of payments being received from Medicare.

69.     On or about February 1, 2023, at approximately 7:24 a.m.,[13] HUSSAIN's Cellular Phone 1,[14] sent an Apple iMessage to CW1's Cellular Phone, reading: "Ok

---

[13] All date and time stamps associated with messages law enforcement recovered from CW1's Cellular Phone are listed as displayed in the software utilized by law enforcement to review CW1's Cellular Phone, which I believe to be UTC.

[14] Law enforcement identified HUSSAIN as the user of HUSSAIN Cellular Phone 1 based on, *inter alia*: (1) T-Mobile subscriber information showing HUSSAIN's Cellular Phone 1 number

bhai we got the login we got the id. We got everything call me when you get chance." A few seconds later, CW1's Cellular Phone responded, "Will be up early working on this." Approximately seven hours later, on or about February 1, 2023, at approximately 2:13 p.m., CW1's Cellular Phone sent, "Call me when ur up . . . need to start the process."

70. On or about February 1, 2023, at approximately 4:25 p.m. a group chat named "Chicago Care" was initiated, initially featuring CW1's Cellular Phone, a phone number ending in x0795 ("CC-2's Cellular Phone 1")[15], and HUSSAIN's Cellular Phone 1. In the chat, CW1's Cellular Phone introduced HUSSAIN's Cellular Phone 1 to CC-2, who was using CC-2's Cellular Phone 1, by writing: "Mehdi this is [CC-2's first name] . . . [He/She] has a couple of questions . . ." CW1's Cellular Phone followed up at approximately 5:27 p.m. and 6:05 p.m., writing "Status update ? . . .

---

was subscribed to 'SYEDMEHDI HUSSAIN' between on or about November 16, 2022, and on or about September 16, 2023; (2) CW1's photo identifications of HUSSAIN and identifications of HUSSAIN as the user of HUSSAIN Cellular Phone 1 based on their review of the "Chicago Care" group chat; (3) the fact that HUSSAIN's Cellular Phone 1 was saved under the name "Mehdi Downers" in CW1's Cellular Phone; (4) below-described messages from the "Chicago Care" group chat in which the user of HUSSAIN Cellular Phone 1 is addressed as "Mehdi"; (5) below-described messages from the "Chicago Care" group chat indicating that the users of HUSSAIN's Cellular Phone 1 and KABLAZADA's Cellular Phone 1 controlled CHICAGO CARE through a nominee owner; and (6) other below-described evidence corroborating CW1's identification of HUSSAIN as one of the concealed owners of CHICAGO CARE, V CARE, and AL-AMEER.

[15] Law enforcement identified CC-2 as the user of CC-2's Cellular Phone 1 based on the following information: 1) subscriber records received from AT&T for CC-2's Cellular Phone 1 which identified CC-2's spouse as the wireless subscriber; 2) CC-2's statement during an interview with law enforcement on or about December 4, 2024, during which CC-2 stated his/her phone number was CC-2's Cellular Phone 1; and 3) CW1's identification of CC-2 as the user of CC-2's Cellular Phone 1.

already 12 and no progress made." A few minutes later, at approximately 6:06 p.m., HUSSAIN's Cellular Phone 1 sent: "Sir guy is on the way I'll update you in a bit." Beginning at approximately 6:10 p.m., CW1's Cellular Phone then sent: "Waiting . . . ? . . . Log in details ? . . . And Mehdi please add your partner."

71.     Approximately ten minutes later, on or about February 1, 2023, at approximately 7:49 p.m., a message appeared in the "Chicago Care" group chat stating, "A new member was added to the group." Seconds later, KABLAZADA, using KABLAZADA's Cellular Phone 1, sent his first message to the group which was a photo labeled "CHICAGOCARE1" and what appears to be a password.[16] CC-2's Cellular Phone 1 then responded with a screenshot of a Medicare Identity and Access

---

[16] Law enforcement identified KABLAZADA as the user of KABLAZADA's Cellular Phone 1 based on, *inter alia*: (1) CW1's photo identifications of KABLAZADA and identifications of KABLAZADA as the user of KABLAZADA's Cellular Phone 1 based on their review of the "Chicago Care" group chat and the "Cc l" group chat; (2) below-described messages dated on or about February 1, 2023, in which KABLAZADA's Cellular Phone 1 was added to the "Chicago Care" group chat after CW1 asked HUSSAIN (whom CW1 addressed as "Mehdi") to add his "partner" to the chat; (3) the fact that CW1 saved KABLAZADA's Cellular Phone 1 in CW1's Cellular Phone as "Murtaza Mehdi" (referencing both the name by which CW1 knew SYED MURTUZA KABLAZADA and SYED MEHDI HUSSAIN, the person who introduced CW1 to KABLAZADA); (4) below-described communications extracted from a phone used by Baqar Hussain Razv Syed ("Baqar") in which Baqar addressed the user of KABLAZADA's Cellular Phone 1 as "brother Murtuza" and provided the user of KABLAZADA's Cellular Phone 1 with login information for a bank account soon before that bank account was accessed from a location consistent with KABLAZADA's home address; (5) toll records showing Baqar's cellular phone made a series of phone calls to the **Subject Phone 1** (subscribed to KABLAZADA) after sending messages to the KABLAZADA's Cellular Phone 1 in which Baqar expressed frustration that the user of the KABLAZADA's Cellular Phone 1 was not responding; (6) below-described messages from the "Chicago Care" and "Cc l" group chats indicating that the user of KABLAZADA's Cellular Phone 1 controlled CHICAGO CARE, V CARE, and AL-AMEER through nominee owners; and (7) other below-described evidence corroborating CW1's identification of KABLAZADA as one of the concealed owners of CHICAGO CARE, V CARE, and AL-AMEER, including KABLAZADA's role in purchasing luxury vehicles with the proceeds of the fraud scheme.

Management System[17] multi-factor authentication screen requesting a verification code be sent to email address c*****@gmail.com,[18] followed by the message "Send me the code." Approximately 18 seconds after CC-2's Cellular Phone 1 requested a code, KABLAZADA's Cellular Phone 1 sent "863557" to the group. Based on my training and experience and knowledge of the investigation, I believe that this exchange between CC-2's Cellular Phone 1 and KABLAZADA's Cellular Phone 1 represented KABLAZADA providing a username, password, and one-time passcode to CC-2 to allow CC-2 access to the CHICAGO CARE account within PECOS.

72. Also, on or about February 1, 2023, beginning at approximately 7:54 p.m., the following exchange, included below as *Image 1*, occurred on the "Chicago Care" group chat[19] between KABLAZADA's Cellular Phone 1, CC-2's Cellular Phone 1 (ending in x0795), indicating KABLAZADA and HUSSAIN together had purchased CHICAGO CARE, had access to the email account that CHICAGO CARE registered with Medicare, and were going to obtain bank account information for a CHICAGO CARE bank account:

---

[17] The Medicare Identity and Access Management System webpage is utilized to access PECOS.

[18] The multi-factor authentication e-mail address was redacted in the screenshot sent by CC-2, however, according to PECOS enrollment records, CHICAGO CARE listed email address 'chicagocarelab@gmail.com' as its correspondence address.

[19] After the addition of KABLAZADA's Cellular Phone 1 to the "Chicago Care" group chat on or about February 1, 2023, the membership in the group chat continued to consist of KABLAZADA's Cellular Phone 1, HUSSAIN's Cellular Phone 1, CW1's Cellular Phone, and CC-2's Cellular Phone 1. As discussed below, while exchanging messages on the "Chicago Care" group chat, CW1 also exchanged direct messages separately (off the group chat) with HUSSAIN's Cellular Phone 1 and KABLAZADA's Cellular Phone 1.



*Image 1*

73.    On or about February 6, 2023, at approximately 4:55 p.m., CW1's Cellular Phone sent a message to the "Chicago Care" group, asking: "What's your email for drop shipping test invoice?" A few minutes later, at approximately 5:02

p.m., HUSSAIN's Cellular Phone 1 responded with "Adafalcon18@gmail.com."[20] On or about February 6, 2023, at approximately 7:30 p.m., KABLAZADA's Cellular Phone 1 sent a photograph to the "Chicago Care" group documenting an electronic payment of approximately $675.00 that was made to CC-2 on or about February 6, 2023. Based on my training, experience, statements from witnesses, and knowledge of this investigation, I believe that this exchange was related to payments made to CC-2 for the shipping of a small number of OTC kits.

74.     On or about February 9, 2023, at approximately 9:35 p.m., KABLAZADA's Cellular Phone 1 sent the "Chicago Care" group a screenshot of a message received from National Government Services Electronic Data Interchange indicating that CHICAGO CARE was approved for electronic transactions through Office Ally,[21] including Health Care claims, Health Care Claim Payment/Advice, and Health Care Claim Status Request & Response. On or about February 13, 2023, at approximately 2:46 a.m., CW1's Cellular Phone sent the "Chicago Care" group a screenshot of Medicare claims submissions on behalf of CHICAGO CARE.

75.     On or about February 13, 2023, at approximately 8:50 p.m., CW1's Cellular Phone sent a message to the "Chicago Care" group, asking: "Mehdi are you

---

[20] The entity Falcon Ada is purportedly owned by Individual A.S., the same nominee owner as CHICAGO CARE. Falcon Ada and the email address Adafalcon18@gmail.com is discussed in more detail later in this affidavit.

[21] Office Ally is a third-party billing clearinghouse approved by Medicare to submit health care claims electronically to Medicare for reimbursement. According to Medicare claims data for CHICAGO CARE, Office Ally was the third-party billing clearinghouse used to submit the fraudulent claims.

back ?" HUSSAIN's Cellular Phone 1, responded: "Yes." CW1's Cellular Phone then sent: "Call me when you guys get done with attorney." On or about February 14, 2023, at approximately 5:33 p.m., CW1's Cellular Phone followed up to the "Chicago Care" group: "Status update for the lab from yesterday . . . Did you get info from them ? . . . Medicare Id . . . Address . . . Company name . . . Pecos info." KABLAZADA's Cellular Phone 1 responded: "The transfer is done it might take a day or two for us to get login Once we get it I'll update you." Based on my training, experience, and knowledge of this investigation, I believe this exchange was related to KABLAZADA and HUSSAIN's purchase of an additional laboratory for use in this scheme.

76.     CW1, CC-2, KABLAZADA, and HUSSAIN continued to communicate through the "Chicago Care" group chat through on or about February 21, 2023, the date of the last message exchanged through the group chat. As discussed below, however, the same four participants (albeit with CC-2 shifting to CC-2's Cellular Phone 2 and HUSSAIN shifting to HUSSAIN's Cellular Phone 2) began a new group chat entitled "Cc l" on or about March 3, 2023, where they continued to discuss CHICAGO CARE, as well as other labs acquired by KABLAZADA and HUSSAIN, including V CARE and AL-AMEER.

77.     On or about March 2, 2023, beginning at approximately 6:38 a.m., CW1's Cellular Phone exchanged a series of iMessages with HUSSAIN's Cellular Phone 1, in which CW1's Cellular Phone sent: "I'm going to get 1000 for Tomm. . . . But make sure as soon as you get check you wire me or deposit check as soon as you get." HUSSAIN's Cellular Phone 1 responded: "Done." Later that day, on or about March

34

2, 2023, at approximately 7:02 p.m., CW1's Cellular Phone sent: "If not today let me know Tomm morn I will upload your leads."

78. According to data extracted from CW1's Cellular Phone, on or about March 3, 2023, CW1 (using CW1's Cellular Phone), CC-2 (using CC-2's Cellular Phone 2[22]), KABLAZADA (using KABLAZADA's Cellular Phone 1), and HUSSAIN (using HUSSAIN's Cellular Phone 2[23]) began a new group chat called "Cc l." That evening, at approximately 9:22 p.m., CW1's Cellular Phone wrote to the group: "Ok so no check so far is a big concern." HUSSAIN's Cellular Phone 2 responded: "Sir usps

---

[22] Law enforcement identified CC-2 as the user of CC-2's Cellular Phone 2 based on information including, but not limited to, the following: 1) law enforcement's observations during a review of CW1's Cellular Phone that CC-2's Cellular Phone 2 was saved under the name "[CC-2's first name] 2"; 2) statements made by Individual M.I. during an interview with law enforcement on or about June 6, 2023, during which Individual M.I. identified CW1 and CC-2 as his/her points of contact for Marketing Company 1 and further provided the phone number for both CC-2's Cellular Phone 1 and CC-2's Cellular Phone 2 as CC-2's; and 3) CW1's identification of CC-2 as the user of CC-2's Cellular Phone 2.

[23] Law enforcement identified HUSSAIN as the user of HUSSAIN Cellular Phone 2 based on, *inter alia*: (1) CW1's photo identification of HUSSAIN and identifications of HUSSAIN as the user of HUSSAIN Cellular Phone 2 based on their review of the "Chicago Care" and "Cc l" group chats; (2) the fact that the "Cc l" group chat was formed approximately one week after the last message was sent on the "Chicago Care" group chat and the below-described messages showing that the "Cc l" group chat was a continuation of the "Chicago Care" group chat; (3) the above-described evidence showing that the other three members of the "Cc l" group chat were CW1, CC-2, and KABLAZADA, the same three individuals who participated with HUSSAIN on the "Chicago Care" group chat; (4) messages exchanged between HUSSAIN, using HUSSAIN's Cellular Phone 1 (subscribed to HUSSAIN), and CW1, in which HUSSAIN and CW1 engaged in one-on-one correspondence regarding topics being discussed contemporaneously among CW1, CC-2, KABLAZADA, and HUSSAIN (using HUSSAIN Cellular Phone 2) on the "Cc l" group chat; (5) below-described messages from the "Cc l" group chat indicating that the users of HUSSAIN's Cellular Phone 2 and KABLAZADA's Cellular Phone 1 controlled CHICAGO CARE, V CARE, and AL-AMEER through nominee owners; and (6) other below-described evidence corroborating CW1's identification of HUSSAIN as one of the concealed owners of CHICAGO CARE, V CARE, and AL-AMEER.

guy is coming waiting for him he said he is on [his] way . . . There was a glich [sic] in mail forwarding so made it right hopefully it will no be an issue from here." CW1's Cellular Phone then replied: "Let's temp stop billing . . . until we figure this out . . . Let us otherwise we have to cancel all the checks through the biller . . . And figure something else out . . . some other way." In response, HUSSAIN's Cellular Phone 2 sent: "When was 2 check released do you have any idea which date ?" CW1 then tagged CC-2's Cellular Phone 2 and asked: "can u log in and check please I'm not infront of laptop."

79.     On or about March 3, 2023, at approximately 10:47 p.m., KABLAZADA's Cellular Phone 1 sent a message to the "Cc l" group consisting of an image of PECOS enrollment information for V CARE's Medicare ID ending in 7810 and an address (7545 W. Irving Park Road in Chicago) consistent with V CARE's listed practice address on NPPES. KABLAZADA's Cellular Phone 1 then followed up with a message stating, "[Individual M.A.]" (the name of the former owner of V CARE), and providing the same birth date for Individual M.A. that was included as Individual M.A.'s in the PECOS enrollment record summary for V CARE.

80.     On or about March 4, 2023, at approximately 2:39 p.m., CC-2's Cellular Phone 2 sent in the "Cc l" group chat: "For Chicago care send voided check asap and bank person name and address." Later that day, on or about March 4, 2023, at approximately 10:08 p.m., CW1's Cellular Phone followed up with HUSSAIN by sending a message directly to HUSSAIN's Cellular Phone 1, asking: "Bro did u manage to get . . . The voided . . . Check[?]" About one minute later, at approximately

10:09 p.m., HUSSAIN, now apparently using HUSSAIN's Cellular Phone 2, responded to CC-2 on the "Cc l" chain, writing: "Yes sir will get that morning."

81. On or about March 6, 2023, at approximately 12:51 p.m., CW1 Cellular Phone followed up on the "Cc l" chat, tagging CC-2 Cellular Phone 2 and writing, "Let's work on Mehdi's EFT." At approximately 3:58 p.m., CC-2 responded: "??"A few minutes later, at approximately 4:05 p.m., CW1 reached out again directly to HUSSAIN's Cellular Phone 1, writing: "call me please." After HUSSAIN's Cellular Phone 1 responded, "5 min," CW1's Cellular Phone replied: "this stuff is important . . . once we set it up then auto pilot."

82. On or about March 6, 2023, at approximately 9:05 p.m., KABLAZADA's Cellular Phone 1 sent an additional photo to the "Cc l" group chat, consisting of a screenshot of PECOS information for AL-AMEER, including AL-AMEER's Medicare ID and address in Carol Stream, Illinois. CC-2's Cellular Phone 2 responded: "Who is that for?" KABLAZADA's Cellular Phone 1 then replied: "We need to start work on this . . . will send you tax I'd [sic] too." KABLAZADA's Cellular Phone 1 then followed up with an image of a partially visible IRS Form SS-4 containing an Employer Identification Number matching that of AL-AMEER. In response, CC-2's Cellular Phone 2 sent: "Company name . . . owner name." KABLAZADA's Cellular Phone 1 then replied: "[Individual M.S.]," the name of the former owner of AL-AMEER. KABLAZADA's Cellular Phone 1 then sent images showing the name and address of AL-AMEER, as well as the National Provider Identification ("NPI") number for AL-AMEER. KABLAZADA's Cellular Phone 1 also sent a date of birth matching the date

of birth listed for Individual M.S. in the PECOS enrollment record summary for AL-AMEER.

83.     On or about March 7, 2023, beginning at approximately 4:29 p.m., CC-2's Cellular Phone 2 sent a series of messages in the "Cc l" chain, stating: "All done . . . Go ahead . . . Buy the lab." KABLAZADA's Cellular Phone 1, replied: "Okay. [Thumbs up emoji]. . . So we start right away on this."

84.     On or about March 8, 2023, at approximately 4:18 a.m., KABLAZADA's Cellular Phone 1 sent a message to the "Cc l" group chat consisting of a screenshot of the CHICAGO CARE Medicare Account which showed that CHICAGO CARE had received two payments of approximately $1,128.96 from "NGS, INC." on or about March 1, 2023, and on or about March 6, 2023. In response, CW1's Cellular Phone sent "Time to [rocket ship emoji]."

85.     On or about March 22, 2023, at approximately 4:31 a.m., CC-2's Cellular Phone 2 wrote to the "Cc l" group chat: "You will receive a email verification from EDI enrollment check it and send me screen shot." CW1's Cellular Phone then responded: "Edi enrollment confirmed." CC-2's Cellular Phone 2 replied: "Text me a screen shot." On or about March 22, 2023, beginning at approximately 10:06 p.m., HUSSAIN's Cellular Phone 2 sent a series of two screenshots of an email with the subject line "EDI Enrollment Packet Completed – NOPHI." The email stated: "National Government Services, Inc. Electronic Data Interchange (EDI) Enrollment Team has processed and completed your Link to Third Party request submitted under Packet ID 437197. You have been approved to transmit and/or receive the following

38

electronic transactions: Health Care Claim . . . Health Care Claim Payment/Advice . . . Health Care Claim Status Request & Response." The email included a header for "Trading Partner Information" in which the "Vendor Information Name" was identified as "Office Ally" and an "Entity Information" section in which the "Entity Name" was identified as AL-AMEER TESTING CENTER INC.

86.     On or about March 27, 2023, beginning at approximately 9:40 p.m., KABLAZADA's Cellular Phone 1 sent to the "Cc l" group chat a pair of screen shot images of a similar "EDI Enrollment Packet Completed – NOPHI" email in which the "Entity Name" was identified as "VCARE TESTING CENTRE CORP" and the "Vendor Information Name" was again identified as "Office Ally."

### ii.      March–May 2023 - KABLAZADA and HUSSAIN Used Cellular Phones to Discuss Fraudulent Billing Through CHICAGO CARE, V CARE and AL-AMEER and Payments to Marketing Company 1, CW1, and CC-2

87.     From in or about March 2023 through in or about May 2023, HUSSAIN used HUSSAIN Cellular Phone 1 and HUSSAIN Cellular Phone 2, and KABLAZADA used KABLAZADA's Cellular Phone 1 to communicate with CW1 and CC-2 about the escalating billing for CHICAGO CARE, V CARE, and AL-AMEER, payments due for the purchase of Medicare data through Marketing Company 1, submission of claims to Medicare through Billing Company 1, and acknowledgement of Medicare beneficiary complaints and overpayment letters sent by Medicare related to OTC kits.

88.     On or about March 29, 2023, at approximately 4:44 p.m., CW1's Cellular Phone sent a message to the "Cc l" group chat reading, "New payment 111k" and

attached a screen shot of a website reflecting the issuance of check numbered 898396865 from NGS for $111,202.56, dated March 28, 2023. JPMorgan Chase bank records for the CHICAGO CARE Medicare Account reflect that a check from NGS for approximately $111,202.56 was posted in the CHICAGO CARE Medicare Account on or about March 30, 2023. Based on my training, experience, and knowledge of this investigation, I believe the screenshot reflected the issuance of a check from NGS to CHICAGO CARE. After the screenshot was sent, on or about March 29, 2023, at approximately 8:24 p.m., CW1's Cellular Phone sent an additional message to the "Cc l" chat stating: "Total due 200655." CW1's Cellular Phone then sent an image reflecting wiring instructions for Marketing Company 1's bank account.

89.     On or about March 30, 2023, at approximately 8:34 p.m., CW1's Cellular Phone sent a message directly to KABLAZADA's Cellular Phone 1, in which CW1's Cellular Phone wrote: "Send it . . . ." At approximately 8:35 p.m., KABLAZADA's Cellular Phone 1 responded: "No boss the person on the way . . . Once he come to me I will definitely send." At approximately 8:39 p.m., KABLAZADA's Cellular Phone 1 sent CW1's Cellular Phone a photograph of a JPMorgan Chase bank "Wire Transfer Outgoing Request" reflecting an approximately $200,655 wire transfer, purportedly initiated by Individual A.S., from the CHICAGO CARE Medicare Account to Marketing Company 1. Seconds later, KABLAZADA's Cellular Phone 1 wrote: "Enjoy boss." Consistent with the photograph of the wire transfer request, JPMorgan Chase bank records show that the CHICAGO CARE Medicare Account made a payment of approximately $200,655 to Marketing Company 1 on or about March 30, 2023.

90.     On or about April 3, 2023, CW1's Cellular Phone sent CC-2's Cellular Phone 2 a voice message which was translated from Urdu into English by an FBI Linguist fluent in Urdu. The FBI linguist provided a summary of the message as "[Message sender] says that s/he just spoke to the individual and s/he has given a check for a hundred thousand, the check for three lakh 23 thousand has been deposited and Citi Bank has confirmed it. [Message sender] continues that Mehdi did not give [message sender] cash but sent him/her seven thousand through Zelle." Consistent with the FBI linguist's summary of the voice message sent from CW1's Cellular Phone, records obtained from Bank of America show that a payment of $7,000 was made from HUSSAIN's Villa Wholesale BoA Account to CW1's company through Zelle on or about April 3, 2023.

91.     On or about April 4, 2023, at approximately 6:03 p.m., CW1's Cellular Phone sent KABLAZADA's Cellular Phone 1 "85,059.41" followed by a screenshot of a document that included the checking account number and routing number for Marketing Company 1's bank account. Later, on or about April 4, 2023, KABLAZADA's Cellular Phone 1 sent CW1's Cellular Phone a screenshot from the CHICAGO CARE Medicare Account that included a pending wire transfer to Marketing Company 1 in the amount of approximately $85,059.41. A review of financial records for the CHICAGO CARE Medicare account included a wire to Marketing Company 1 in the amount of approximately $85,059.41 on or about April 4, 2023.

41

92. On or about April 6, 2023, KABLAZADA's Cellular Phone 1 sent CW1's Cellular Phone a picture of a CMS letter notifying CHICAGO CARE of a payment it received from Medicare in error. The overpayment letter indicated that the reason for the overpayment was one or both of the following: (1) "You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount"; and (2) "You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changed mandated by legislation."

93. On or about April 12, 2023, at approximately 4:21 p.m., CW1, using CW1's Cellular Phone, sent a direct message to KABLAZDA's Cellular Phone 1, in which CW1 wrote: "Good news for vcare." CW1's Cellular Phone then sent a screenshot showing "Electronic Claim Submission Payer Responses" for an account associated with "vcaretcor." The screenshot identified the payer as "Medicare Illinois" and indicated that approximately 11,516 claims for a total of approximately $1,381,920 had been "accepted."

94. On or about April 17, 2023, beginning at approximately 3:36 p.m., CW1 's Cellular Phone sent two direct messages to KABLAZADA's Cellular Phone 1 containing screenshots that appear to reflect the status of claims submitted by CHICAGO CARE and AL-AMEER. In the first screenshot, the name "chicagolab" appeared at the top above a "HEALTH CARE CLAIM PAYMENT/ADVICE" indicating "1400 claims" corresponded to an "Amount" of "131712.00." The second

42

screenshot reflected "Electronic Claim Submission Payer Responses Provided by Office [Ally]" and identified "alameerlab" at the top. The message identified the payer as "Medicare Illinois" and indicated that approximately 32,666 claims for approximately \$3,919,920 had been "accepted."

95.     On or about April 19, 2023, KABLAZADA's Cellular Phone 1 sent CW1's Cellular Phone a picture of a Bank of America account. Although no account number was visible, multiple transactions on the account were viewable, including a 'counter credit' of approximately \$10,424.00 on or about April 14, 2023, and a 'counter credit' of approximately \$17,640.00 on or about April 17, 2023. A review of financial records for the AL-AMEER Medicare Account included counter credits of approximately \$10,424.00 and approximately \$17,640.00 on or about April 14, 2023, and on or about April 17, 2023, respectively.

96.     On or about April 22, 2023, beginning at approximately 1:44 p.m., CW1's Cellular Phone sent to KABLAZADA's Cellular Phone 1 a series of five PDF files, each of which attached a separate multi-page "Medicare Remittance Advice" reflecting claims submitted by AL-AMEER and anticipated payments based on those claims. Based on my review of the remittance advices, the vast majority of the claims reflected in the remittance advices were purportedly for OTC kits with dates of service in 2022.

97.     On or about April 26, 2023, HUSSAIN's Cellular Phone 2 shared an image of a letter mailed to CHICAGO CARE to the "Cc l" WhatsApp group. The letter, included below as *Image 2*, was written by Medicare beneficiary L.A. regarding a

43

"COVID-19 kit" received by Medicare beneficiary L.A. that they had neither requested nor wanted.



April 17, 2023.

To: Chicago Care Lab Serv. LI
2646 W. Pratt Blvd.
Chicago, IL 60645.4506
(872) 208-7046

Re: ████████████████████

* Provision of covid-19 test.

To whom it may concern:

To begin with - "I do not know who you are and did not request this service from you or anybody else". How did you get my information?. I certanly never gave it to you since - again - I do not know who you are and do not want this kind of service from anybody. What you are doing is not correct, it is called fraud and harassment towards me. Please let it be the first and last time if you mail me this covid-19 kit. Did not request it from you or anybody else. Your prompt attention and action on this matter is appreciated. Do not mail more! Thank you,
████████████████
* cc: medicare agency.

44

*Image 2*

Law enforcement reviewed the Medicare claims data for CHICAGO CARE, which included a claim submitted to Medicare by CHICAGO CARE on or about March 13, 2023, for OTC kits purportedly provided to Medicare beneficiary L.A. on or about March 2, 2023. CHICAGO CARE was paid approximately $94.08 for that claim on or about March 27, 2023.

98.     On or about April 26, 2023, and on or about May 2, 2023, in the same "Cc l" WhatsApp group chat that included KABLAZADA's Cellular Phone 1, HUSSAIN's Cellular Phone 2 sent photographs of multiple CMS letters notifying CHICAGO CARE of more Medicare payments CHICAGO CARE received in error.

99.     On or about May 3, 2023, in the "Cc l" WhatsApp group chat, HUSSAIN's Cellular Phone 2 shared a photograph of an e-mail documenting a complaint received from Medicare beneficiary G.S. regarding fraudulent billing by V CARE for OTC kits. Included below as *Image 3*, is a copy of the e-mail sent to the group.

45



*Image 3*

Law enforcement reviewed the Medicare claims data for V CARE, which included a

claim submitted to Medicare by V CARE on or about April 10, 2023, for OTC kits

46

purportedly provided to Medicare beneficiary G.S. on or about September 12, 2022. V CARE was paid approximately $94.08 for that claim on or about April 24, 2023.

100.     On or about May 11, 2023, CC-2's Cellular Phone 2 sent a message to the "Cc l" group stating "[CW1's Cellular Phone] share your bank info here" . . . and "[KABLAZADA's Cellular Phone 1] transfer 500k to [CW1] account." In response, KABLAZADA's Cellular Phone 1 replied "K." and CC-2's Cellular Phone 2 responded "We will apply that towards Chicago." Later, on or about May 11, 2023, KABLAZADA's Cellular Phone 1 shared an image of a 'wire transfer outgoing request' from Falcon Ada to a company owned by CW1 in the amount of approximately $496,888.64. A review of JPMorgan Chase records for Falcon Ada account xxxxx1880 included a wire transfer to CW's company in the amount of approximately $496,888.64 on or about May 12, 2023; however, the wire was reversed.

101.     Bank records and Medicare claims data show that the volumes of OTC kit claims CHICAGO CARE, V CARE, and AL-AMEER submitted to Medicare, as well as the volumes of payments CHICAGO CARE, V CARE, AL-AMEER, and Falcon Ada made to Marketing Company 1, continued to increase (rather than decrease) after KABLAZADA and HUSSAIN circulated the above-referenced complaints from Medicare beneficiaries and Medicare overpayment demands.

      a.     According to Medicare claims data, from on or about April 26, 2023, through on or about June 7, 2023, CHICAGO CARE submitted approximately 454,542 claims for OTC kits resulting in approximately $40,299,356.16 in payments from Medicare, approximately 71.5% of the approximately $56,336,366.24 total

amount paid to CHICAGO CARE for OTC kit claims during the period from on or about February 1, 2023, through on or about June 7, 2023. Of the claims submitted on or after on or about April 26, 2023, approximately 263,933 claims (approximately 41.6% of the total claims) resulting in approximately $22,936,515.84 in payments from Medicare (approximately 40.71% of the total) were for purported dates of service in 2022, before Individual A.S. even became the nominee owner of CHICAGO CARE.

b.     From on or about April 26, 2023, through on or about June 7, 2023, V CARE submitted approximately 561,416 claims for OTC kits resulting in approximately $51,565,494.96 in payments from Medicare, approximately 92.6% of the approximately $55,664,689.92[24] total amount paid to V CARE for OTC kit claims during the total period from on or about February 1, 2023, through on or about June 7, 2023. Of the claims submitted after on or about April 26, 2023, approximately 429,923 claims (approximately 68.9% of the total) resulting in approximately $39,613,218.96 in payments from Medicare (approximately 71.2% of the total) were for purported dates of service in 2022, before Individual A.K. and Individual I.M. became nominee owners of V CARE.

c.     From on or about April 26, 2023, through on or about June 7, 2023, AL-AMEER submitted approximately 575,826 claims for OTC kits resulting in approximately $52,846,135.44 in payments from Medicare, approximately 90.7% of

---

[24] As stated above, approximately $33,965,063.55 of Medicare payments to V CARE were held in a payment suspension escrow account and never deposited into the V CARE Medicare Account.

the approximately $58,277,467.92 total amount paid to AL-AMEER for OTC kit claims during the total period from on or about February 1, 2023, through on or about June 7, 2023. Of the claims submitted on or after on or about April 26, 2023, approximately 444,182 claims (approximately 69.9% of the total) resulting in approximately $40,839,375.36 in payments from Medicare (approximately 70.1% of the total) were for purported dates of service in 2022, before Individual H.M. became the nominee owner of AL-AMEER.

      d.    According to bank records for Marketing Company 1's bank account, of the approximately $13,596,443.15 that Marketing Company 1 received from CHICAGO CARE, V CARE, AL-AMEER, and Falcon Ada from on or about March 30, 2023, through on or about May 24, 2023, approximately $12,287,410.44 (or approximately 90.4%) was paid during the period from on or about April 26, 2023, through May 24, 2023.

      **3.**    **KABLAZADA and HUSSAIN Engaged in Financial Transactions with, and Used Cellular Phones to Communicate with, the Former and Nominee Owners of CHICAGO CARE, V CARE, AL-AMEER, Falcon Ada, Incare and Innovation Enterprises During the Commission of the Fraud Scheme**

      **i.**    **CHICAGO CARE and Falcon Ada**

102.    On or about January 22, 2022, Individual K.K. opened the CHICAGO CARE Medicare Account at JP Morgan Chase Bank. In opening this account, Individual K.K. listed his telephone number (XXX) XXX – 5786 ("x5786") on the bank account signature card. Additionally, during an interview with law enforcement on

or about December 14, 2023, Individual K.K. identified x5786 as his phone number. As described above, Individual A.S. was added as a signatory on the CHICAGO CARE Medicare account on or about March 9, 2023, and became the sole signatory on the account on or about May 10, 2023.

103. During Individual K.K.'s interview with law enforcement on or about December 14, 2023, Individual K.K. stated that he sold CHICAGO CARE to Individual A.S. on or about February 2, 2023, but the sale occurred after business hours, and he could not sign over the CHICAGO CARE bank accounts to Individual A.S. at that time. Following the sale, Individual K.K. was informed that until his name was removed from Medicare enrollment documents, he was still considered to be a 5% owner of the corporation, and he could not remove his name from the CHICAGO CARE bank accounts.

104. According to T-Mobile service provider records, between on or about January 27, 2023, and on or about April 5, 2023, when CHICAGO CARE had so far fraudulently billed Medicare for at least approximately $7,310,760.00 and been paid approximately $5,287,542.96 in OTC kits claims, x5786 and KABLAZADA's Cellular Phone 1 called each other approximately 74 times.

105. In addition to the CHICAGO CARE Medicare Account, Individual A.S. became the signatory on bank accounts for an additional Illinois corporation, Falcon Ada. According to financial records, between on or about July 27, 2022, and on or about May 2, 2023, Individual A.S. opened at least 14 accounts in the name of Falcon Ada at various financial institutions including Bank of America, BMO Harris,

JPMorgan Chase, and US Bank. According to records obtained from the Illinois Secretary of State, articles of incorporation were filed by Individual A.S. on or about July 21, 2022, establishing Falcon Ada, but no other publicly available filing history exists. According to financial institution records, between on or about March 29, 2023, and on or about May 24, 2023, Falcon Ada received approximately $21,692,074.87 from the CHICAGO CARE Medicare Account, and the V CARE Medicare Account.

106.    A review of the account opening documents, signature cards, and online banking access documents for the various Falcon Ada accounts included e-mail address adafalcon18@gmail.com on two Falcon Ada accounts held at Old National Bank[25] and e-mail address adafalcon18@gamil.com [*sic*] on two Falcon Ada accounts held at Huntington Bank.[26] Additionally, Falcon Ada utilized a username 'adafalcon18' on accounts held at JPMorgan Chase, BMO Harris, and Huntington Bank. As noted above, when CW1's Cellular Phone asked for an e-mail address to send a drop shipping test invoice on or about February 6, 2023, HUSSAIN's Cellular Phone 1 responded "Adafalcon18@gmail.com."

107.    According to records received from Verizon, '[Individual A.S.'s first and last name]' was subscribed to telephone number (XXX) XXX−9236 ("x9236") between on or about January 1, 2021, and on or about June 5, 2023. As described below, the

---

[25] The Old National Bank account numbers for Falcon Ada were xxxxx0315 and xxxxx0326.

[26] The Huntington Bank account numbers for Falcon Ada were xxxxx0164 and xxxxx9984.

**Subject Phone 1**, KABLAZADA's Cellular Phone 1, HUSSAIN's Cellular Phone 1, and HUSSAIN's Cellular Phone 2 all communicated with telephone number x9236.

    a.    According to T-Mobile service provider records for KABLAZADA's Cellular Phone 1, between on or about June 30, 2022, and on or about May 12, 2023, during which time CHICAGO CARE submitted the majority of its fraudulent billing for OTC kits, x9236 and KABLAZADA's Cellular Phone 1 communicated approximately 79 times through calls and text messages.

    b.    According to T-Mobile service provider records for the **Subject Phone 1**, between on about August 8, 2022, and on or about October 12, 2022, x9236 and the **Subject Phone 1** communicated approximately 45 times through calls and text messages.

    c.    According to T-Mobile service provider records for HUSSAIN's Cellular Phone 1, on or about February 21, 2023, HUSSAIN's Cellular Phone 1 attempted to dial x9236, however the call was registered as an 'abnormal completion.'

    d.    According to T-Mobile service provider records for HUSSAIN's Cellular Phone 2, between on or about October 31, 2022 and on or about April 2, 2023, HUSSAIN's Cellular Phone 2 and x9236 called each other at least 14 times.

108.    According to records received from Bank of America, HUSSAIN was the sole signatory for a business checking account in the name of Villa Wholesale Inc. with account number xxxxx2662 (the "Villa Wholesale BoA Account"). The Villa Wholesale BoA Account was opened on or about April 20, 2021, and was closed on or about March 11, 2024.

52

109.    According to records for the Villa Wholesale BoA Account, between on or about January 19, 2023, and on or about March 20, 2023, the Villa Wholesale BoA Account sent approximately eight payments totaling approximately $30,310 to 'Falcon Ada Inc' through Zelle.[27] Additionally, on or about April 3, 2023 the Villa Wholesale BoA Account received approximately two Zelle payments totaling approximately $14,000 from 'Falcon Ada Inc.' On or about January 23, 2023, the Villa Wholesale BoA Account sent approximately $700 to '[Individual A.S.'s first and last name]' through Zelle.

## ii.    V CARE

110.    On or about March 18, 2022, Individual M.A. opened the V CARE Medicare Account at BMO Harris bank. On or about May 23, 2023, Individual A.K. and Individual I.M. replaced Individual M.A. as the signatories on the V CARE Medicare Account.

111.    According to records received from Amazon, an account owned by a 'Syed M Kablazada' included in its list of billing addresses an address on the 6600 block of North Harlem Avenue, Chicago, Illinois, that was included on KABLAZADA's Illinois Driver's License issued on or about May 10, 2022. According to Amazon records, an individual named '[first and last name of Individual A.K.]' had a shipping profile set up under KABLAZADA's Amazon account with the same address on the 6600 block of North Harlem Avenue, Chicago, Illinois, listed.

---

[27] Zelle is a peer-to-peer payment service which functions in a similar way as Venmo, Cash App, and Paypal.

112.    According to records received from the Illinois Secretary of State, V CARE included telephone number (XXX) XXX-8468 ("x8468") with a payment made by Individual M.A. to the Illinois Secretary of State for a Registered Agent filing on or about March 21, 2023. According to T-Mobile service provider records for KABLAZADA's Cellular Phone 1, between on or about February 27, 2023, and on or about May 1, 2023, x8468 and KABLAZADA's Cellular Phone 1 communicated approximately 148 times through calls and text messages.

113.    According to records for the Villa Wholesale BoA Account, between on or about October 24, 2022, and on or about February 27, 2023, the Villa Wholesale BoA Account received approximately eight payments totaling approximately $89 from '[last name, first name of Individual A.K.]' and '[first and last name of Individual A.K.]' through Zelle.

### iii.    AL-AMEER and Incare Health Services, Inc.

114.    On or about February 25, 2022, Individual M.S. opened the AL-AMEER Medicare Account at Bank of America. As described above, Individual H.M. replaced Individual M.S. as the sole signatory on the AL-AMEER Medicare account on or about April 11, 2023.

115.    On or about October 19, 2023, law enforcement interviewed Individual M.S. regarding AL-AMEER. According to Individual M.S., Individual M.S. sold AL-AMEER to Individual A.A. in or around February of 2023. Individual M.S. stated that he was aware that approximately 15 days after Individual A.A. purportedly acquired

AL-AMEER, Individual A.A. sold AL-AMEER to an individual with the first and last name of Individual H.M.

116. According to records for the Villa Wholesale BoA Account, on or about October 28, 2022, and on or about October 31, 2022, the Villa Wholesale BoA Account received approximately two payments totaling approximately $58 from '[first name, last name of Individual A.A.]' through Zelle.

117. In addition to the AL-AMEER Medicare Account, Individual H.M. became the signatory for an additional Illinois corporation, Incare Health Services, Inc. ("Incare Health Services"). According to financial records from JPMorgan Chase, on or about April 27, 2023, Individual H.M. opened account number xxxxx8671 ("Incare Health Services Chase Account") and became its sole signor. According to records obtained from the Illinois Secretary of State, Incare Health Services was incorporated by Individual H.M. on or about April 17, 2023. According to financial records received for the Incare Health Services Chase Account, between on or about May 9, 2023, and on or about May 22, 2023, the Incare Health Services Chase Account received approximately $1,018,905.00 from the AL-AMEER Medicare Account.

118. During a law enforcement interview of Individual M.S. on or about October 19, 2023, Individual M.S. stated that Individual H.M. utilized telephone number (XXX) XXX-6985 ("x6985"). Additionally, Individual H.M. included telephone number x6985 on the signature card for the Incare Health Services Chase Account. As described below, the **Subject Phone 1** and HUSSAIN's Cellular Phone 1, both communicated with telephone number x6985:

a.     According to T-Mobile toll records for the **Subject Phone 1**, between on or about April 23, 2022, and on or about May 14, 2023, x6985 and the **Subject Phone 1** called each other approximately 420 times.

b.     According to T-Mobile toll records for HUSSAIN's Cellular Phone 1, between on or about February 13, 2023, and on or about March 12, 2023, x6985 and HUSSAIN's Cellular Phone 1 called each other approximately four times.

119.    Additionally, law enforcement received records for a credit card Individual H.M. opened through Bank of America. In his/her credit card application, Individual H.M. identified telephone number (XXX) XXX-9309 as his/hers. As described below, the **Subject Phone 1** and HUSSAIN's Cellular Phone 1, both communicated with telephone number x9309:

a.     According to T-Mobile toll records for the **Subject Phone 1**, between on or about June 23, 2022, and on or about April 5, 2023, x9309 and the **Subject Phone 1** communicated with each other approximately 30 times.

b.     According to T-Mobile toll records for x9309, between on or about May 9, 2022 and on or about November 25, 2022, x9309 and HUSSAIN's Cellular Phone 1 communicated with each other approximately five times.

#### iv.     Innovation Enterprises Inc.

120.    On or about May 3, 2023, the V CARE Medicare Account sent approximately $487,455.00 to an account in the name of Innovation Enterprises Inc. at Bank of America. According to records received from the Illinois Secretary of State, articles of incorporation establishing Innovation Enterprises Inc. ("Innovation

56

Enterprises") were filed on September 13, 2022, by Baqar Hussain Syed ("Baqar"). According to records received from various financial institutions, between on or about September 21, 2022, and on or about March 3, 2023, Baqar opened accounts in the name of Innovation Enterprises at Bank of America, BMO Harris, and PNC Bank (collectively the "Innovation Enterprises Bank Accounts").

121. On or about July 2, 2023, Baqar was charged by criminal complaint with one count of health care fraud for his own role in an OTC kit fraud scheme involving Luna Labs LLC. On or about December 1, 2023, Baqar was charged by information with one count of health care fraud and on or about April 16, 2024, Baqar pled guilty.[28]

122. Baqar was interviewed by law enforcement on or about July 3, 2023. During this interview, Baqar identified two individuals known to Baqar as "Murtuza" and "Mehdi" as people who worked on laboratories. Baqar explained that he met with "Murtuza," "Mehdi," and two additional individuals to sign as the owner of two companies – Innovations Enterprises and Husi Inc. – and that Baqar accepted. Financial institution records show that Baqar then opened bank accounts for those companies. Specifically, Baqar opened and became the signor on two Innovation Enterprises accounts held at Bank of America and two Innovation Enterprises accounts held at BMO Harris. Additionally, Baqar was the signor on two Husi, Inc. accounts held at JPMorgan Chase.

---

[28] See *United States v. Baqar Hussain Razv Syed*, No. 23 CR 385 (N.D. Ill.). On July 28, 2024, Baqar was sentenced to 24 months' imprisonment by the Hon. Matthew F. Kennelly.

123. During this interview, Baqar provided law enforcement consent to search his cellular telephone answering to (XXX) XXX-2614 ("Baqar's Cellular Phone"). Law enforcement recovered the following WhatsApp communications sent from Baqar's Cellular Phone to KABLAZADA's Cellular Phone 1[29]:

    a.    A message sent to KABLAZADA's Cellular Phone 1 in a message thread titled 'Innovation' on or about January 26, 2023, reading "Greetings brother Murtuza, I tried reaching you because I wanted to inquire about the corporation you agreed to give me."

    b.    A message sent to KABLAZADA's Cellular Phone 1 in a message thread titled 'Innovation' on or about February 24, 2023, reading "Brother Murtuzaa, I tried reaching you. Can you give me a call back once you get free?"

    c.    A message sent from KABLAZADA's Cellular Phone 1 on or about May 11, 2023, reading "Incare health services inc" with a photograph of an address that matched the Incare Health Services Inc. address listed on the signature card for an Incare Health Services Inc. account at JPMorgan Chase.

    d.    A series of messages sent to KABLAZADA's Cellular Phone 1 between on or about May 17, 2023, and on or about May 28, 2023, reading "Greeting brother! . . . Tried reaching you . . . Brother, I have been trying reaching you constantly . . . Brother, what happened . . . You asked me to call you but you are not

---

[29] KABLAZADA's Cellular Phone 1 was observed as saved in Baqar's Cellular Phone under the name "Agah Saab." Conversations between Baqar's Cellular Phone and KABLAZADA's Cellular Phone 1 were primarily written in Urdu. FBI linguists fluent in Urdu provided the translations for these messages documented here.

answering any of my call . . . Have you turned off your phone and if it is on then why are you not answering my phone call?" . . . "Brother, call please? . . . "Brother Murtuza!" . . . "I have been continuously trying calling you" . . . and "Brother, can you please call me back?"

124. Between on or about May 19, 2023, and on or about May 30, 2023, a similar time frame as when Baqar's attempts to reach KABLAZADA's Cellular Phone 1 went unanswered on Baqar's Cellular Phone, toll records received from T-Mobile show that Baqar's Cellular Phone called the **Subject Phone 1** on 17 occasions. T-Mobile toll records show that these 17 communications between Baqar's Cellular Phone and the **Subject Phone 1** were the only times when the two phones contacted each other between on or about April 23, 2022, and on or about April 16, 2024.

125. Additionally, according to T-Mobile toll records for Baqar's Cellular Phone, on or about October 31, 2022, and on or about November 18, 2022, HUSSAIN's Cellular Phone 2 and Baqar's Cellular Phone communicated twice.

126. Based on my training and experience, I know it is common for those engaged in criminal activity to obtain and use one or more "burner" cellular telephones that are not directly attributable to the criminal actor through subscriber records – that is, a cellular telephone subscribed in an alias name or in the name of a third party – to engage in and facilitate criminal conduct. Criminals also frequently use multiple cellular telephones as a means to compartmentalize communications; for example, using one cellular telephone to communicate with the government and other entities involved in billing for, and receiving funds derived from, claims for

59

health care services; but using another cellular telephone or messaging application to communicate with those co-scheming to fraudulently submit claims and obtain such funds. Finally, it is not uncommon for those participating in criminal activity to maintain a "clean" cellular telephone used principally to communicate with others – such as family members or friends – who are *not* engaged in criminal activity. Based on my training and experience and the pattern of communication between Baqar's Cellular Phone, KABLAZADA's Cellular Phone 1, the **Subject Phone 1**, and the communication described above in the "Chicago Care" and "Cc l" WhatsApp chats, I believe that KABLAZADA'S Cellular Phone 1 was KABLAZADA's "burner" cellular phone, and the **Subject Phone 1** was KABLAZADA's "clean" cellular phone, as evidenced by the fact that Baqar only contacted KABLAZADA's "clean" cellular phone when he was unable to reach KABLAZADA on his "burner" cellular phone. Additionally, I believe HUSSAIN's Cellular Phone 1 was HUSSAIN's "clean" cellular phone and HUSSAIN's Cellular Phone 2 was HUSSAIN's "burner" cellular phone, as evidenced by the fact that HUSSAIN's Cellular Phone 2 was not subscribed to HUSSAIN's name and communication regarding CHICAGO CARE, V CARE, and AL-AMEER switched from HUSSAIN's Cellular Phone 1 to HUSSAIN's Cellular Phone 2 as the fraud scheme progressed.

127. Additionally, based on the review of WhatsApp messages recovered from Baqar's Cellular Phone, on or about February 4, 2023, KABLAZADA's Cellular Phone 1 and Baqar's Cellular Phone exchanged a series of WhatsApp messages with one another related to bank account number xxxxx2241 held in the name of Innovation

Enterprises (the "Innovation Enterprises PNC Account"), in which KABLAZADA's Cellular Phone 1 requested information to gain access to this bank account. According to records received from PNC Bank, the Innovation Enterprises PNC Account was opened on or about September 27, 2022, and as of on or about April 16, 2024, Baqar remained the only signor on the account.

128.    On or about February 4, 2023, KABLAZADA's Cellular Phone 1 sent a message to Baqar's Cellular Phone, asking, "Can you send the logins for pnc[?]" Baqar's Cellular Phone responded by sending a photo of a page on which someone had handwritten the bank account number and routing number for the Innovation Enterprises PNC Account, along with an "Online ID" and "Password." Approximately four minutes later, KABLAZADA's Cellular Phone 1 replied by sending a screenshot of a PNC website prompt asking for a response to the security question, "What were your wedding colors?" Seconds later, Baqar's Cellular Phone replied, "Red." Approximately one minute later, KABLAZADA's Cellular Phone 1 sent a screenshot of an additional PNC website prompt asking for a response to the security question, "What was the TV series you liked the most as a child?" Baqar's Cellular Phone responded: "Tom and jerry" to which KABLAZADA's Cellular Phone 1 wrote back "with space[?]." Finally, Baqar's Cellular Phone wrote back, "Yes . . . ."

129.    Based on my training and experience, I believe that KABLAZADA, using KABLAZADA's Cellular Phone 1, attempted to gain access to the Innovation Enterprises PNC Bank Account on or about February 4, 2023, by asking Baqar for

the Innovation Enterprises PNC Bank Account username, password, and the answers to security questions on the account.

130. Additionally, I know from my training and experience that PNC Bank in some instances obtains location data in the form of GPS latitude and longitude coordinates from electronic devices used during interactions with PNC Bank systems and accounts. In this instance, PNC Bank records show location data was captured from an electronic device that interacted with the Innovation Enterprises PNC Bank Account on or about February 4, 2023. These location data records show the user's electronic device was located at or in the immediate vicinity of a residential address located on the 6600 block of North Harlem Avenue, in Chicago, Illinois.

131. According to records received from American Express for three separate American Express accounts held by KABLAZADA, KABLAZADA's residential address was the same address on the 6600 block of North Harlem Avenue in Chicago, Illinois, between on or about January 10, 2022, and on or about November 8, 2024. Additionally, according to an Illinois Driver's License for KABLAZADA that was issued on or about May 10, 2022, KABLAZADA's residential address was the same address on the 6600 block of North Harlem Avenue, Chicago, Illinois.[30] During an interaction with the Richardson, Texas Police Department on or about August 18, 2023, discussed further below, KABLAZADA's residential address on the 6600 block of North Harlem Avenue, Chicago, Illinois was included in the report.

---

[30] On or about November 29, 2023, KABLAZADA obtained a new Illinois Driver's License which listed a residential address in Arlington Heights, Illinois.

### 5. KABLAZADA Accessed and Used Proceeds of the Fraud Scheme

132.    Based on bank records, information obtained from car dealerships, and statements KABLAZADA made to law enforcement during a traffic stop, KABLAZADA used proceeds from the fraud scheme to participate in the acquisition of two luxury vehicles.

#### i. White Cadillac Escalade ESV purchased with funds from Falcon Ada

133.    Between on or about March 31, 2023, and on or about May 15, 2023, Falcon Ada account number xxxxx5304 (the "Falcon Ada BMO Harris Account") received approximately $548,633.61[31] directly from the CHICAGO CARE Medicare Account, which, as described above, constituted fraud proceeds.

134.    Based on financial records from the Falcon Ada BMO Harris Account, on or about May 16, 2023, Falcon Ada purchased a cashier's check in the amount of approximately $218,829.00, made payable to Franklin Nissan.

135.    Based on records received from Franklin Nissan located in Columbia, Kentucky, this cashier's check was utilized for an in-person purchase of a 2023 White Cadillac Escalade ESV with vehicle identification number 1GYS4SK91PR215553 (the "White Cadillac") on or about May 17, 2023. Additionally, the White Cadillac was purportedly purchased by Individual A.S. for the Falcon Ada business.

---

[31] Additional payments were made to the Falcon Ada BMO Harris Account and other Falcon Ada accounts directly from the CHICAGO CARE Medicare Account. The scope of the payments here are limited to payments received in the Falcon Ada BMO Harris Account prior to the purchase of a cashier's check described in more detail below.

136.    On or about April 12, 2024, law enforcement interviewed Individual S.L., the salesperson who sold the White Cadillac to Individual A.S. on or about May 17, 2023. Individual S.L. stated that Individual A.S. was accompanied by approximately two additional individuals to the sale. Law enforcement provided Individual S.L. with an unlabeled copy of KABLAZADA's Illinois Driver's license and Individual S.L. identified the person depicted in KABLAZADA's Illinois Driver's license as one of the individuals present with Individual A.S. for the purchase of the White Cadillac.

137.    According to records received from Zeigler Buick GMC located in Lincolnwood, Illinois, Individual Am.S. brought the White Cadillac to Zeigler Buick GMC for vehicle service on or about August 5, 2023. When obtaining the vehicle service, Individual Am.S. provided Zeigler Buick GMC with contact phone number (XXX) XXX-6603 ("x6603"). According to service provider records for KABLAZADA's Cellular Phone 1, x6603 and KABLAZADA's Cellular Phone 1 were in contact with each other at least twice on or about May 15, 2023, two days immediately prior to the purchase of the White Cadillac.

**ii.      Black Cadillac Escalade ESV Purchased with funds from Incare Health Services**

138.    Between on or about May 9, 2023, and on or about May 23, 2023, an Incare Health Services account number xxxxx8671 at JPMorgan Chase (the "Incare JPMorgan Chase Account") received approximately $1,018,905.00 directly from the

AL-AMEER Medicare Account, which, as described above, constituted fraud proceeds.

139.    Based on financial records from JP Morgan Chase Bank, on or about May 31, 2023, the Incare JP Morgan Chase Account purchased a cashier's check in the amount of approximately $228,039.38 and made payable to Cadillac of Naperville located in Naperville, Illinois.

140.    Based on records received from Cadillac of Naperville, on or about May 31, 2023, the cashier's check was utilized to purchase a 2023 Black Cadillac Escalade ESV with vehicle identification number 1GYS4SK99PR173388 (the "Black Cadillac"). Additionally, the Black Cadillac sales records indicate the vehicle was purportedly purchased by Individual H.M. for the Incare Health Services business.

141.    Pursuant to a Grand Jury subpoena, Cadillac of Naperville produced surveillance footage from on or about May 31, 2023, and related to the sale of the Black Cadillac. The surveillance footage included a group of approximately five individuals who accompanied Individual H.M. to the dealership. The left side of *Image 4* below is a still photograph from the surveillance footage depicting one of the individuals who accompanied Individual H.M. for the purchase of the Black Cadillac, and the photograph on the right is from KABLAZADA's Illinois Driver's license.



*Image 4*

142.    On or about April 16, 2024, law enforcement interviewed Individual J.B., an employee at Cadillac of Naperville involved with the sale of the Black Cadillac to Individual H.M. Law enforcement provided Individual J.B. with an unlabeled copy of KABLAZADA's Illinois Driver's license and Individual J.B. recognized KABLAZADA as one of the individuals present with Individual H.M. for the purchase of the Black Cadillac.

143.    On or about August 18, 2023, the Black Cadillac was stopped by law enforcement in Richardson, Texas, while KABLAZADA was driving the vehicle.

KABLAZADA initially informed the responding officer that he had borrowed the Cadillac from a friend, but later claimed to be renting the vehicle to drive for Uber.

### 6. KABLAZADA Continues to Utilize the Subject Phone 1

144. T-Mobile subscriber records for the **Subject Phone 1** show that as of on or about February 11, 2025, the **Subject Phone 1** is subscribed to a "Syed Kablazada States Networks LLC" with KABLAZADA's date of birth listed. These records further show that the T-Mobile service plan for the **Subject Phone 1** was still active and that toll records for the **Subject Phone 1** indicate that the **Subject Phone 1** is still actively making and receiving phone calls as of at least on or about January 29, 2025, which was the date records were requested from T-Mobile.

### 7. HUSSAIN Utilizes the Subject Phone 2

145. Based on records received from CBP, HUSSAIN departed the United States on or about July 23, 2023. According to records received for HUSSAIN's Cellular Phone 1 and HUSSAIN's Cellular Phone 2, the subscriber for both phones changed after HUSSAIN departed the United States and therefore HUSSAIN is no longer believed to be using either HUSSAIN's Cellular Phone 1 or HUSSAIN's Cellular Phone 2.

146. Based on records received from CBP, HUSSAIN returned to the United States on or about January 21, 2025. In or around January of 2025, HUSSAIN contacted CW1 over WhatsApp from a WhatsApp account number that began with the country code for India. HUSSAIN and CW1 exchanged numerous WhatsApp messages and calls while HUSSAIN utilized this WhatsApp account. HUSSAIN's use

of the WhatsApp account included organizing two in-person meetings attended by HUSSAIN, KABLAZADA, CW1, and a fourth individual whose identity is known to the United States.[32]

147.  CW1 wore a covert recording device to both meetings attended by HUSSAIN, KABLAZADA, and the fourth individual. The four participants in the meeting primarily conversed in Urdu. Following the recorded meeting, CW1 provided law enforcement with a summary of the meeting. Additionally, an FBI linguist fluent in Urdu provided a summary translation of the events discussed during the recordings. Both CW1 and the FBI linguist detailed that the meeting participants described portions of the prior scheme involving CHICAGO CARE, V CARE, and AL-AMEER in addition to HUSSAIN and KABLAZADA expressing interest in beginning a new, similar health care scheme.

148.  On or about April 3, 2025, the honorable Virginia M. Kendall authorized the installation and use of a pen register and trap and trace device on HUSSAIN's WhatsApp account[33] which was utilized to set up the in-person meetings described above. On or about April 8, 2025, the government began receiving data from WhatsApp pursuant to the pen register and trap and trace device installation. Included within the responsive records were IP addresses utilized while the WhatsApp account user interacted with their WhatsApp account. Pursuant to a

---

[32] Law enforcement performed surveillance at both in-person meetings to confirm the identity of KABLAZADA and HUSSAIN.

[33] See 25 M 60111 (Under seal)

Grand Jury subpoena, T-Mobile produced records related to two separate IP addresses utilized by HUSSAIN's WhatsApp account. Both IP addresses were assigned to telephone number (331) 289 − 9625 (the "**Subject Phone 2**") at the time of their utilization by HUSSAIN's WhatsApp account. According to the subscriber records received from T-Mobile for the **Subject Phone 2**, the subscriber for the **Subject Phone 2** was "Mehdi Hussain" and the name listed under billing details was "Syed Mehdi."

149. On or about February 20, 2025, HUSSAIN applied for a new Illinois driver's license. On or about April 17, 2025, Law enforcement received records from the Illinois Secretary of State Police related to HUSSAIN's Illinois Driver's license application. Included within the application under "remarks" was the phone number for the **Subject Phone 2**.

## III.  USE OF CELLULAR TELEPHONES GENERALLY

150. Based upon my training and experience, I know that cellular telephones may contain evidence relevant to the **Subject Offense**. For example, text messages and similar communications on messaging apps that are made or received from the **Subject Phone 1** and **Subject Phone 2** that are located in its memory may provide information regarding the identities of, and the methods and means of operation and communication used by, any participants in the offenses that are the subject of this investigation. Moreover, digital photographs located in the memory of the **Subject Phone 1** and **Subject Phone 2** may contain images of the tools or participants involved in the offenses that are the subject of this investigation. Also, digital

photographs stored in the **Subject Phone 1** and **Subject Phone 2** may contain images of the user of the **Subject Phone 1** and **Subject Phone 2**, the user's associates (including persons involved in or knowledgeable about the **Subject Offense**), places frequented by the user of the phone leading up to and during the **Subject Offense**, and locations and instrumentalities used in committing the **Subject Offense**.

151. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cellular telephone can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cellular telephone at a relevant time. Further, such stored electronic data can show how and when the cellular telephone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular telephone account owner.

70

152. Additionally, information stored within a cellular telephone may indicate the geographic location of the cellular telephone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cellular telephone owner's state of mind as it relates to the offenses under investigation. For example, information in the cellular telephone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cellular telephone itself or by a program that deletes or over-writes the data contained within the cellular telephone, such data will remain stored within the cellular telephone indefinitely. Based on my training and experience, I know that individuals often transfer data from one cellular telephone to another if they obtain a new cellular telephone.

153. Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones, and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phone 1** is associated with KABLAZADA and the **Subject Phone 2** is associated with HUSSAIN, and because, in my experience and in the experience of other agents, subjects use cellular telephones to contact other participants in their criminal conduct

71

(such as those co-scheming with the owner of the **Subject Phone 1** and **Subject Phone 2**), there is probable cause to believe that the **Subject Phone 1**, further described in Attachment A-1, and **Subject Phone 2**, further described in Attachment A-2, contain evidence of violations of the **Subject Offense**.

154. Additionally, based on my training and experience, I know it is common for those engaged in criminal activity to obtain and use one or more "burner" cellular telephones that are not directly attributable to the criminal actor through subscriber records — that is, a cellular telephone subscribed in an alias name or in the name of a third party, or in no name[34] — to engage in and facilitate criminal conduct. Criminals also frequently use multiple cellular telephones as a means to compartmentalize communications; for example, using one cellular telephone to communicate with the government and other entities involved in billing for, and receiving funds derived from, claims for health care services; but using another cellular telephone or messaging app to communicate with those co-scheming to fraudulently submit claims and obtain such funds. Finally, it is not uncommon for those participating in criminal activity to maintain a "clean" cellular telephone used principally to communicate with others — such as family members or friends — who are *not* engaged in criminal activity. In this investigation, and as described above, KABLAZADA and HUSSAIN have both been shown to use at least two different cellular telephones to communicate with others regarding the **Subject Offense**.

---

[34] For example, as indicated above in this case (¶66), subscriber information for KABLAZADA's Cellular Phone 1 did not contain a subscriber name.

155.   Considering these facts, because KABLAZADA and HUSSAIN have used the **Subject Phone 1** and **Subject Phone 2**, respectively, and additional cell phones in connection with the **Subject Offense**, and because, in my experience and in the experience of other agents, subjects use cell phones to contact other participants in their criminal conduct, there is probable cause to believe that evidence relevant to this investigation will be recovered from the **Subject Phone 1, Subject Phone 2** and any other cellphone recovered from the person or within the immediate control of KABLAZADA and HUSSAIN, including in any bag or container within their immediate control.

## IV.   SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

156.   Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.   Electronic storage media, such as a cellular telephone, can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This

73

requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.    Searching electronic storage media, such as a cellular telephone, for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

157.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

158.    In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

159.    The warrant I am applying for would permit law enforcement to obtain from KABLAZADA and HUSSAIN the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock the **Subject Phone 1**, **Subject Phone 2**, or any other cellphone found on their person or in any bag or container in their immediate control. I seek this authority based on the following:

    a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some cellphones offer a combination of these biometric features, and the user of such cellphones can select which features they would like to utilize.

    b.    If a device, such as a cellphone, is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is

75

registered, a user can unlock a cellphone by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on cellphones produced by other manufacturers have different names but operate similarly to Touch ID.

      c.     If a cellphone is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The cellphone's camera then analyzes and records data based on the user's facial characteristics. The cellphone can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on cellphones produced by other manufacturers have different names but operate similarly to Face ID.

      d.     In my training and experience, users of electronic devices such as cellphones often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a cellphone than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a cellphone's contents. This is particularly true when the users of a cellphone are engaged in criminal activities and thus have a heightened concern about securing the contents of a cellphone.

e.     As discussed in this affidavit, based on my training and experience, I believe that the **Subject Phone 1** and other cellphones will be found on the person or within the immediate control of KABLAZADA during his arrest and that the **Subject Phone 2** and other cellphones will be found on the person or within the immediate control of HUSSAIN during his arrest. The passcode or password that would unlock the cellphone(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the **Subject Phone 1, Subject Phone 2**, or other cellphones found on the person or within the immediate control of KABLAZADA and HUSSAIN, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.     I also know from my training and experience, as well as from information found in publicly available materials including those published by cellphone manufacturers, that biometric features will not unlock a cellphone in some circumstances even if such features are enabled. This can occur when a cellphone has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked cellphone equipped with biometric features, the

77

opportunity to unlock the cellphone through a biometric feature may exist for only a short time. Thus, it will likely be necessary for law enforcement to have the ability to require KABLAZADA and HUSSAIN to unlock the **Subject Phone 1** and **Subject Phone 2** or other cellphones found on their person or within their immediate control using biometric features in the same manner as discussed above.

h.   Due to the foregoing, if law enforcement personnel encounter a cellphone that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of KABLAZADA and HUSSAIN to the fingerprint scanner of the cellphone;[35] and (2) hold the respective **Subject Phone 1** and **Subject Phone 2** or any other cellphone found on the person or within the immediate control of KABLAZADA or HUSSAIN, in front of the face of KABLAZADA or HUSSAIN, and activate the facial recognition feature, for the purpose of attempting to unlock the cellphone in order to search its contents as authorized by this warrant.

## V.   PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

160.   Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information (as described in Attachment A) so that they may be

---

[35] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

161. The review of electronically stored information and electronic storage media removed from the **Subject Phone 1**, and any other cellular phone recovered from the person or within the immediate control of KABLAZADA, described in Attachment A-1, and from the **Subject Phone 2**, and any other cellular phone recovered from the person or within the immediate control of HUSSAIN, described in Attachment A-2, may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

   a.   examination of all the data contained in such computer hardware, computer software, and/or memory storage devices within the cellphones to determine whether that data falls within the items to be seized as set forth in the applicable Attachment B;

   b.   searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in the applicable Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, or (2) evidence of the offenses specified above);

79

c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in the Attachment B;

d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in the applicable Attachment B.

162.    The government will return the **Subject Phone 1, Subject Phone 2**, and any cellphone found on the person or within the immediate control of KABLAZADA and HUSSAIN, within 60 days of their removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## VI.    CONCLUSION

163.    Based on the above information, I respectfully submit that there is probable cause to believe that on or about May 11, 2023, SYED MEHDI HUSSAIN and SYED MURTUZA KABLAZADA knowingly and willfully executed and attempted to execute a scheme to defraud Medicare, and to obtain by means of false and fraudulent pretenses, representations, and promises, any of the money owned by and under custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services, by submitting and causing to be submitted a claim for the provision of eight OTC kits for beneficiary S.D., when such services were not provided, in violation of Title 18, United States Code, Section

80

1347. Further, I respectfully submit that there is probable cause to believe that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B-1, will be found in the **Subject Phone 1** and any other cellphone found on the person or within the immediate control of KABLAZADA, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B-2, will be found in the **Subject Phone 2** and any other cellphone found on the person or within the immediate control of HUSSAIN. I therefore respectfully request that this Court issue a criminal complaint and arrest warrants for KABLAZADA and HUSSAIN; a search warrant for the **Subject Phone 1** and any other cellphone found on the person or within the immediate control of KABLAZADA, as described in Attachment A-1, and authorizing the seizure of items described in Attachment B-1, pursuant to the protocol described in the addendum to Attachment B-1; and a search warrant for the **Subject Phone 2** and any other cellphone found on the person or within the immediate control of HUSSAIN, as described in Attachment A-2, and authorizing the seizure of items described in Attachment B-2, pursuant to the protocol described in the addendum to Attachment B-2.

164. Additionally, based on the foregoing, I request that the Court issue two search warrants for prospective location and other information from Provider, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrants will also function as a pen register order under 18 U.S.C. § 3123, authorizing the installation and use of pen register and trap and trace devices to record, decode, and/or capture the dialing, routing, addressing, and signaling

81

information described above for each communication to or from the **Subject Phone 1** and **Subject Phone 2**, to include the date, time, and duration of the communication, without geographic limit, for a period of 30 days pursuant to 18 U.S.C. § 3123(c)(1).

165.    I further request that the Court direct Provider to disclose to the government any information described in Attachments B-3 and Attachment B-4 that is within the possession, custody, or control of Provider. I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-3 and Attachment B-4 unobtrusively and with a minimum of interference with Provider's services, including the installation and operation of pen register and trap and trace devices and by initiating a signal to determine the location of the **Subject Phone 1** and **Subject Phone 2** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

166.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants served on Provider to delay notice for 90 days, until August 6, 2025.[36] This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18

---

[36] 90 days from May 9, 2025, is August 6, 2025, a Wednesday.

U.S.C. § 2705. Providing immediate notice may seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

167.    I further request that the Court authorize execution of the two warrants served on Provider at any time of day or night, owing to the potential need to locate the **Subject Phone 1** and **Subject Phone 2** outside of daytime hours. In addition, because the warrants will be served on Provider, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrants at any time in the day or night.

168.    I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may provide the two search warrants to the Provider. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

FURTHER AFFIANT SAYETH NOT.

Randell M. Harold by MV

_____

Randell M. Harold
Special Agent, FBI

Sworn to and affirmed by telephone the 9th day of May, 2025

_____

Honorable Maria Valdez
United States Magistrate Judge

84